MILWAUKEE BOSTON STORE, Appellant, vs. KATZ and another, Respondents.
SAME, Respondent, vs. SAME, Appellants.

*March 14—May 31, 1913.*

*Contracts: "Lease" of space in department store: Quasi-partnership: Violation: Equitable action for cancellation, accounting, etc.: Remedy at law inadequate: Unlawful detainer: Construction of contract: Commissions on "gross sales:" Forfeiture for breach: Waiver: Application of payments: Relief in equity against forfeiture: Inequitable conduct of other party: Accounting: Advertising.*

1. A contract by which plaintiff, the proprietor of a large department store, "leased" to defendants certain space for the maintenance of a department in such store, and which contained among other features provisions for the carrying on of a joint business and a division of the proceeds between the parties, for joint possession of certain aisles and approaches in the store and of certain portions of space leased, and for retention by plaintiff of the key to the store, was more than a lease and might more properly be denominated a partnership or *quasi*-partnership agreement.

2. An action based on a wilful violation of such contract by said defendants and an election by plaintiff to terminate the contract in accordance with its terms for that reason, wherein plaintiff asked that the lease be declared canceled and defendants be ordered and adjudged to quit and surrender the premises to the plaintiff and be enjoined from interfering with plaintiff's possession thereof, and also asked the appointment of a receiver and for an accounting which would involve complicated business relations covering a number of years, is *held* properly maintainable in equity, being in the nature of a suit for dissolution of a partnership and for an accounting, and the remedy at law by an action of unlawful detainer being inadequate.

3. Said contract provided that defendants should pay to the plaintiff "ten per centum on the gross sales of said department" and that "all merchandise sold in said department and money received from sales shall be immediately delivered to and handled by" the plaintiff. *Held*, that the terms "gross sales" and "all merchandise sold" included so-called cost sales to employees of the defendants, and that plaintiff was entitled to the stipu-

lated commission upon such sales, irrespective of whether or not the defendants made a profit upon them.

4. Evidence showing, among other things, that defendants—knowing that the agreement entitled plaintiff to ten per cent. commission on all sales, that all sales were required to be reported to plaintiff and go through the regular channels of its business, and that it had no means of knowing what the sales were or of collecting commissions thereon unless they were reported— actually concealed from plaintiff the cost sales to employees and others, both by the manner in which the bundling and delivery was done and by the manner in which the books were kept, is *held* to sustain a finding that defendants intentionally violated the contract.

5. Plaintiff, after learning on September 15th that such unreported cost sales had been made in violation of the contract, promptly demanded a full statement thereof. Such a statement was made to it on September 29th, and it then first learned the extent of such sales. On October 2d it notified defendants of its election to cancel the contract and lease as therein provided because of such breach. *Held*, that plaintiff had not, by continuing to do business under the contract and receiving the benefits thereof up to the time of such notice, waived the forfeiture.

6. A waiver must be predicated upon the intentional relinquishment of a known right; and in order to constitute a known right the substantial facts and circumstances out of which the right springs must be known.

7. At the time of giving notice of cancellation of the agreement, plaintiff offered to continue to transact the business of the department in the manner in which it had theretofore been transacted, without prejudice to the right to insist upon a forfeiture, until a surrender of the premises by defendants. Defendants refused to surrender possession, notified plaintiff that they should continue to hold under their lease, and demanded that plaintiff continue to perform its duties thereunder. Plaintiff then gave notice that pending the determination of an action to enforce its rights the business of the department would be conducted on its part substantially as theretofore, except that it would apply for an order authorizing the deposit of the proceeds of sales or so much thereof as might be sufficient to indemnify it against loss or damage by reason of defendants' unlawful withholding of the premises; and stated that until such order should be made the percentage of the proceeds of sales which it should retain as theretofore would be applied on account of such loss and damage. Plaintiff never applied for

such order, and the business was thereafter conducted precisely as it had been before, plaintiff retaining the stipulated percentage. *Held*, that by so continuing the business plaintiff waived its right to insist upon the forfeiture.

8. Under the circumstances stated, plaintiff must be held to have retained the stipulated percentage as the compensation provided in the agreement. If defendants owed plaintiff damages for withholding possession, they also owed it said percentage on sales made. Hence they as debtors, and not the plaintiff as creditor, had the right to say upon what debt the moneys which they turned over to plaintiff should be applied; and their unequivocal notice to plaintiff that they should continue to hold and do business under the contract was equivalent to a direction that the ten per cent. to be retained by plaintiff should be applied as theretofore.

. 9. The fact that great loss would accrue to plaintiff from a sudden termination of the business relations between the parties did not give it the right to continue such relations even temporarily for its own advantage, and to reap the benefits thereof, without waiving the forfeiture.

10. When, as in the case stated with respect to such forfeiture and the waiver thereof, declarations and conduct are at variance, the conduct and acts of a party must be held to outweigh declarations and be controlling.

11. The condition of the contract which defendants violated, requiring them to report all sales and at once turn over to plaintiff the proceeds thereof, was one intended as security for the payment of the ten per cent. commission to which plaintiff was entitled, and full compensation for such breach can be made by a money payment; hence, even in the absence of any waiver, equity may relieve against the forfeiture resulting from such breach.

12. It appearing that a large business had been built up in defendants' department, the good will of which was of great value; that plaintiff would have almost the whole benefit thereof if defendants were required to vacate the premises; that plaintiff's conduct had been inequitable, in that it had withheld from defendants the fact that it had secured rebates on advertising contracts, a portion of which belonged to defendants, and had wrongfully kept back and retained other considerable sums to which defendants were entitled, it is *held* that, even if there had been no waiver of the forfeiture, equity would relieve against it.

13. Under the terms of the contract between the parties with reference to advertising, and the practical construction which they.

gave it from the beginning, plaintiff was not entitled to reimbursement from defendants for moneys paid for newspaper space occupied by head-plates containing the name of the store and by editorial matter relating generally to the store and not to any specific department; nor could the cost of trading stamps properly be charged to this class of general advertising.

APPEALS from a judgment of the circuit court for Milwaukee county: JAMES WICKHAM, Judge. *Affirmed.*

Suit in equity for an accounting and to quiet plaintiff's title to certain space in its store, known as the *Milwaukee Boston Store,* hereinafter referred to as the *Boston Store.* On the 7th day of September, 1906, the plaintiff, the party of the first part, and the defendant *Herman Katz,* the party of the second part, entered into an agreement, of which the following, so far as this case is concerned, are the material parts:

"Said party of the first part, in consideration of the covenants and promises hereinafter made by the party of the second part, does hereby lease and demise to said party of the second part for the term beginning the first day of May, 1907, and ending the thirtieth day of April, 1922, that part of the second floor of the building known as the *Boston Store,* or Plankinton Block, at the southeast corner of Grand avenue and Fourth street in the city of Milwaukee, as follows: That certain space indicated by diagram thereof attached hereto and made a part of this contract having approximately nineteen thousand two hundred and thirty square feet in area; it being agreed, however, that the space of three feet immediately east of the demised premises to be maintained and kept open as an aisle for the general use of said store; it being also agreed that possession of the westerly portion of the second floor of the so-called Yewdale Building is not to be given to second party until May 1, 1908; said space to be used by said party of the second part for the sole purpose of selling at retail on said premises the following described merchandise, to wit: women's and misses' furs and ready-to-wear outer garments, except wrappers, kimonas and lounging gowns; also children's furs and ready-to-wear outer garments in sizes from four years up, but not including infants' sizes from one to five years; also ladies', misses' and children's ready-to-wear

millinery, head wear and trimmings thereof, except for infants from one to five years of age; it is understood that the said party of the second part at all times during the term of this lease and the extension thereof is to have the exclusive right to sell in said *Boston Store,* or Plankinton Block, the merchandise above described and none other, and that during such period the said first party will not license the sale of any such merchandise by any person other than the party of the second part; it being agreed, however, that said party of the first part shall be at liberty to make such alterations in the front or interior of said building as it shall from time to time deem to be to the advantage of the business of the *Boston Store,* but not so as to unfavorably affect the business of party of the second part.

"Open passageways shall be kept at all times to, through and from said department to elevators, stairways, aisles and the other departments of said *Boston Store* without obstruction of any kind, and second party agrees to devote sufficient open space for bundlers' and cashiers' desks to accommodate said department at such places therein as said party of the first part shall from time to time direct."

"Said party of the second part agrees to furnish suitable store furniture and fixtures for the space occupied by him at his own expense, which fixtures, except those which shall be permanently fixed, may be removed by him at will from said premises upon the termination of this lease either by lapse of time or for any of the reasons hereinafter set forth; and said party of the second part promises and agrees that in the use of said fixtures and in the display and arrangement of the merchandise of said party of the second part, said party of the second part will at all times submit to the reasonable direction and dictation of said party of the first part."

"Access to said building shall be allowed to party of the second part at all reasonable times, but the keys of said building are to be retained by the party of the first part or its agent.

"And the party of the second part further covenants, promises and agrees that he and his employees and agents will at all times conform to all requirements of law and to such reasonable rules and regulations as the party of the first part may from time to time establish with respect to the conduct

of 'business of the *Boston Store,* notice of which rules and regulations shall have been given to said party of the second part; and does further covenant, promise and agree that said party of the second part will not employ any person or persons in or about the business of said department, except the head of the cloak and the head of the millinery departments who shall be objectionable to the party of the first part, and if such persons shall be employed by him he, she or they shall be removed upon request of said party of the first part and refused admittance to said store.

"And said party of the second part does expressly covenant that this contract and lease shall become void and all rights of said second party thereunder immediately cease if at any time during said term said party of the second part shall, after notification, wilfully sell or allow to be sold in said department any other wares or merchandise than that herein-. before specified; or shall assign this lease or sublet the whole or any part of said premises except to a corporation to be formed by him, his liability to first party, however, remaining the same as before such assignment; or shall for the period of two days, without reasonable cause, fail to carry on the business of said department; or shall at any time wilfully and intentionally fail to comply in all respects with the reasonable rules of said party of the first part respecting the management of said *Boston Store;* or shall wilfully and intentionally so conduct the business of his department as to detract from the good reputation of the *Boston Store;* or shall wilfully and intentionally violate any of the other covenants, promises or agreements herein contained; and said party of the second part further covenants, promises and agrees that in case said party of the second part shall during said term become insolvent or be adjudged a bankrupt, or a petition in bankruptcy be filed by him, or if such corporation be adjudged bankrupt, or if a mortgage or a bill of sale be executed of the merchandise in said department, said party of the second part will, in either case, on demand of said party of the first part surrender said demised premises and cancel this contract and thereby make the same null and void, and does hereby grant unto said party of the first part the right, privilege and option, upon the happening of either of said events, to take immediate possession of said premises and to

purchase and acquire from said party of the second part, or his assigns, all and singular the merchandise, furniture, property and effects then on hand, or any part thereof, belonging to said department at a valuation to be agreed upon by said parties at that time, or in case of disagreement, at a price to be ascertained by the award of two arbitrators, one of whom shall be chosen by said party of the first part, and one of whom shall be chosen by said party of the second part, and a third if necessary to be chosen by said two arbitrators in case of their disagreement, the award or ascertainment by any two of said arbitrators to be binding; it being understood that said party of the first part may elect to purchase said described merchandise upon said ascertained valuation if said party of the first part shall see fit to, but said party of the first part shall have the right to decline to make such purchase and may remove the property of the party of the second part from said leased premises or from the *Boston Store* forthwith at the cost and expense of the said party of the second part, and may store the same at the cost and risk of said party of the second part in any storage warehouse in the city of Milwaukee.

"Said party of the second part promises and agrees to advertise continuously (but not necessarily each day) his merchandise and department in conjunction with the party of the first part to the extent hereinafter mentioned in all mediums selected by the party of the first part, and agrees to advertise his merchandise and department in no other manner without the consent of party of the first part; and further promises and agrees to expend during each year no less than three per cent. of the gross sales of the business of said department for such advertising, both general and special, including trading stamps, the cost of which stamps is not to exceed one half of said three per cent.; and to allow said party of the first part to manage and control said advertising in all respects; it being understood that said party of the second part shall have advertising space and location commensurate with the relative importance of his department; and does also agree to contribute towards the expense and loss of what is known as 'Charge Account' a *pro rata* percentage not exceeding five per centum upon all charge sales of said *Boston Store* made by said party of the second part, it being understood that said party of the

second part is fully informed and recognizes the so-called 'Credit System' in force at the *Boston Store,* and will make no credit sales except through said 'Charge Account,' the books of which shall, during reasonable hours, be open to inspection by said party of the second part.

"And said party of the second part, in consideration of the premises, does hereby promise, covenant and agree to and with said party of the first part, that during the continuance of said lease said party of the second part will pay to said party of the first part a commission on the gross sales made by the party of the second part through said department, as follows: Ten per centum on the gross sales of said department. . . .

"And it is agreed by said parties that all payments by said party of the first part to party of the second part shall be made in cash in weekly instalments each week during the term of this lease, seventy-five per centum thereof on Mondays, and the remainder of said week's instalment after deducting the amount of commissions and rental belonging to party of the first part and all other indebtedness owing by second party; and said party of the second part agrees that all merchandise sold in said department and money received from sales shall be immediately delivered to and handled by the cashier of the party of the first part to be held as trust funds only for said party of the second part, except such sums as shall be deducted therefrom for the commission or other expense or indebtedness belonging to said party of the first part; the balance of the moneys, after such deductions are made, shall be paid by the party of the first part in cash to said party of the second part, during week following such sales, during the term of this lease.

"The party of the first part agrees to furnish said party of the second part with cashier, cash service, bundlers, window trimmer and janitor service, and further agrees to deliver all goods sold by the party of the second part through the regular and customary delivery system in use in said *Boston Store,* and does further agree to furnish heat, light and elevator service and power for alterations pertaining to said department, without cost or charge to said party of the second part.

"It is further understood and agreed that all business of

said department transacted by said party of the second part shall be done upon the above described leased premises and all deliveries made therefrom, and shall be exclusively done in the name of the *Boston Store,* and that all wrapping paper, boxes and other wrappings deemed necessary for merchandise sold or delivered out of this department shall have the name of the *Boston Store* printed thereon and no other name than that of the party of the first part, the party of the first part to furnish all necessary wrapping paper and twine, but party of the second part is to furnish all necessary boxes, and other wrappings deemed necessary by him, and that all printing done by party of the second part shall be done in the general style adopted by the party of the first part."

"And said parties of the first and second part have also expressly agreed that notwithstanding the covenants herein contained said party of the first part reserves the privilege and shall be at liberty at all times to open and conduct at such place in the *Boston Store* as it shall desire what is known as 'Bargain Sales Room' at which competing lines of merchandise may be carried and sold for the purpose of said 'Bargain Sales Room,' it being understood and agreed that party of the second part shall have the right to join in the purchase and sale of all merchandise pertaining to his department in said 'Bargain Sales Room,' also to make sales of merchandise therein from his own department, it being also understood that in all cases where second party declines to join in purchases therefor, said party of the first part may nevertheless make the same.

"It is further agreed that the party of the second part shall have the right to use the two windows east of the main entrance, as now existing in the *Boston Store,* for display purposes at all times, except that during the period between the tenth and twenty-fifth days of December in each year the party of the second part may use one half of said space, the displays in said show windows to be arranged by the window trimmer to be furnished by said party of the first part, he to regard the reasonable wishes of second party in that behalf."

"And said party of the second part further promises, covenants and agrees that at the termination of said lease by lapse of time, or otherwise, said party of the second part will promptly and peaceably remove his merchandise and effects

from said department and from said *Boston Store*, if said party of the first part shall so direct, and expressly waives and relinquishes all rights of a tenant holding over under the statute, and does further promise and agree that he will not hereafter hold out or advertise his merchandise as having at any time been in a department of the *Boston Store*, or that said merchandise, or said party of the second part, has ever theretofore been connected with the *Boston Store*.

"It has been also agreed that if said first party shall have its present lease of the *Boston Store* extended beyond the year 1922, said second party shall have the right to a like extension of this lease so as to cause the same to be in force and effect during said extended term as though the term originally created hereby were identical therewith.

"All of the provisions and premises herein contained shall inure to the benefit of and be binding upon said first and second parties and their respective successors or legal representatives and the corporation to be formed by party of the second part as above provided."

The grounds of the action alleged in the complaint, as summarized by plaintiff's counsel in their brief, were that the defendants had wilfully and intentionally violated the contract, in that they had wilfully and intentionally failed to comply with the reasonable rules and regulations established by the plaintiff for the handling and delivery of merchandise sold through said department and the handling of the proceeds of sales to insure the proper accounting and the transaction of the business through the proper channels; and in that all of the business of the department had not been done exclusively in the name of the plaintiff in the manner required by the terms of the agreement and the reasonable rules and regulations established by the plaintiff and known to the defendant, but that, in wilful and intentional violation of the terms of the contract, they had made numerous sales through the department, aggregating large sums of money, which they intentionally and fraudulently suppressed and concealed from the knowledge and information of the plaintiff, and the proceeds of which they wilfully and fraudulently

omitted to turn over or deliver to the plaintiff or its cashier
to be held in trust and accounted for as provided by the con-
tract, but which they fraudulently converted and appropri-
ated to their own use without accounting to the plaintiff for
the commissions which, under the terms of the contract, were
the property of the plaintiff.

That by reason of such wilful and intentional violations the
plaintiff, prior to the commencement of the action, had duly
elected to terminate the contract and that the same had been
duly terminated in accordance with the terms thereof.    That
the plaintiff had an interest in the business of all the depart-
ments of the store, all of which was required to be conducted
exclusively in its trade name, and that as the proprietor of
said store it had, through such departments, including the
department conducted by the defendants, built up a large and
valuable patronage in the city of Milwaukee and elsewhere
throughout the state, the good will of which was the prop-
erty of the plaintiff and of great value; that to avoid the sac-
rifice of such good will and irreparable loss to the plaintiff it
was necessary that the business of such departments, includ-
ing that which had been conducted by the defendants, should
be continued without substantial interruption, and to that end
it was necessary that the provision of the contract authorizing
the plaintiff to purchase the stock and fixtures on hand should
be specifically enforced.    That notwithstanding the premises
and the termination of the contract the defendants had re-
fused to vacate the department, but had persisted in the oc-
cupation thereof with their furniture, fixtures, and stock of
merchandise, but that such occupation by them since the ter-
mination of the contract had been and was without the con-
sent of the plaintiff and wrongful, and that because of such
wrongful refusal to surrender to the plaintiff the use and oc-
cupation of said department it was compelled under protest
to continue to transact the business thereof through the de-
fendants until its rights in the premises could be enforced by

the court. That the defendants had not kept or preserved any proper or accurate account of the sales made through said department and not reported or accounted for to the plaintiff, and had destroyed many of their books of account and other records in which, as claimed by them, the transactions had been recorded, by reason of which and the falsification of such books and accounts in relation to said transactions as had been preserved, and because the facts and details in relation to the transactions were wholly within the knowledge of the defendants, the plaintiff was unable to state the amount thereof, and that an intricate and difficult accounting would be required.

The prayer for relief was that a receiver be appointed to take charge of the department pending the determination of the action to conserve the business and good will thereof for the benefit of the plaintiff under such directions of the court as regards the conservation and distribution of the proceeds of sales as should be deemed just and equitable; that the provision of the contract giving the plaintiff the right to purchase the stock and fixtures in the contingency which had happened be specifically enforced, and that the defendants be enjoined from interfering with the business or with the possession of said department by the plaintiff, subject to such rights as might be conferred on the receiver; that an accounting be had, to determine the amount of the sales upon which no commissions were received by the plaintiff, and that the defendants be ordered and adjudged to pay the amount with interest found to be due on such accounting; that the cancellation and termination of said agreement and lease made by the notice as alleged in the complaint be confirmed and said agreement and lease declared to have been terminated and canceled; that it be adjudged and decreed, in view of the cancellation of the contract, that the plaintiff is entitled, as against the defendants or either of them, their agents, servants, or employees, to the possession of the premises, and that

they be ordered and adjudged to quit and surrender the same to the plaintiff and be permanently and forever enjoined from interfering with the possession thereof by the plaintiff, and that the plaintiff have and recover from the defendants the damages to which it is legally and equitably entitled by reason of the wrongful withholding of the possession of said premises by the defendants since the termination of the contract, and for general relief.

That part of plaintiff's prayer for relief seeking a decree for specific performance in relation to the purchase of the stock was withdrawn upon the trial and is not insisted upon on this appeal.

The defendants' answer denied, generally, the legal effect of the steps taken by the plaintiff to terminate the contract; denied that the sales not reported or accounted for were sales within the terms of the lease, or, if they were within its terms, denied that the violation of the contract in respect thereof was wilful and intentional, and alleged that the plaintiff had waived the grounds of the forfeiture relied on in the complaint by continuing the business after notice of the violation of the contract. It further alleged that plaintiff had fraudulently overcharged them on certain accounts under the contract, by reason whereof it did not come into a court of equity with clean hands and was not entitled to the relief prayed for in the complaint.

The cause of action asserted in the first counterclaim was, in substance, that the plaintiff had received various rebates from newspapers on account of advertising which should have been distributed among the departments, but which it had fraudulently retained; that it had fraudulently retained a large sum on the trading-stamp account in excess of the cost of the stamps which it was entitled to retain, and as a result of the payment of five per cent. on all charge sales by the various departments a large surplus was accumulated which should

have been distributed, but which the plaintiff had fraudulently appropriated to its own use.

Plaintiff's notice, dated September 30, 1911, served October 2, 1911, was as follows:

"You will take notice that you have wilfully and intentionally violated the covenants, promises and agreements on your part contained in the contract and lease under which you hold and occupy the cloak, suit, millinery and waist department of the *Milwaukee Boston Store* in that you have persistently failed to report to the *Milwaukee Boston Store* sales made by you in said department or to account to the *Milwaukee Boston Store* for commissions to which it was entitled on such sales.

"You are further notified that the *Milwaukee Boston Store* elects to terminate and cancel said contract and lease which was entered into between *Milwaukee Boston Store* and said *Herman Katz* and bears date the 7th day of September, 1906, and hereby demands that you forthwith quit and surrender up the same to the *Milwaukee Boston Store,* and the said *Milwaukee Boston Store* hereby offers to purchase and acquire all the merchandise, furniture, property and effects belonging to you and on hand in said department at a valuation to be agreed upon by the parties or at a price to be ascertained by arbitration in the manner provided for in said contract and lease.

"You are further notified that in the event of your failure to so vacate and surrender possession of said premises on or before the 7th day of October, 1911, the *Milwaukee Boston Store* will proceed to enforce its rights to the possession of said premises and its right to acquire said merchandise, furniture, property and effects in accordance with the provisions of said contract and to an accounting for the commissions to which it is entitled from all sales heretofore made by you and not reported or upon which the commissions provided for in said contract have not been paid.

"Until your vacation and surrender of the premises as herein required, to avoid irreparable loss to either party, we will at your option or until further notice from us continue to transact the business of the department in the manner in

which it has heretofore been transacted by us, without prejudice, however, to our right to insist upon the forfeiture of your rights under said contract and lease."

The defendants' answer thereto, dated October 2, 1911, read:

"In answer to your demand and notice to quit, we have to say that we have referred the same to our attorneys, Mr. Hoyt and Mr. Glicksman, submitting the whole matter to them. We are advised by them that your claimed right to terminate our lease is wholly without foundation. We therefore refuse to comply with your demand and hereby notify you that we shall continue to occupy the premises covered by our lease, and we demand that you continue to perform the duties imposed upon you thereunder."

The final notice served by plaintiff on defendants, dated October 4, 1911, was as follows:

"In view of your positive refusal to comply with the notice and demand heretofore served upon you to vacate and surrender the possession of the department of the *Milwaukee Boston Store* heretofore held and occupied by you, confirming said notice heretofore served upon you, you are further notified that pending the determination of the action which has been begun to enforce the rights of the *Milwaukee Boston Store* in the premises all goods sold by you from said department and delivered to us will be accounted for and handled by us and the business of said department, regardless of the contract which has been terminated, will be conducted on our part substantially as heretofore, except that we shall apply to the court as soon as practicable for an order authorizing the deposit, until the surrender by you of said department, of the proceeds of such sales or so much thereof as may be sufficient to indemnify us against loss or damage sustained by us and which may hereafter be sustained by reason of your unlawful withholding from us of the possession of said department to which we are now entitled. And in the meantime and until such order shall be made the percentages of the proceeds of sales which we shall retain as heretofore will be applied on account of such loss and damage."

The court found as facts:

"1. That the defendant *Herman Katz* from May 1, 1907, to May 17, 1907, and thereafter the defendant *Milwaukee Apparel Company,* a corporation, of which the said *Katz* was president and principal manager, from May 17, 1907, to October 2, 1911, operated certain departments in the plaintiff's department store known as the *Boston Store* in the city of Milwaukee under and pursuant to the provisions of that certain contract and lease, a copy of which is attached to the plaintiff's complaint and marked Exhibit A.

"2. That on October 2, 1911, the plaintiff served on the defendants a certain written notice, stating among other things that the plaintiff elected to cancel and terminate said contract and lease and demanding that the defendants surrender possession of the premises occupied thereunder, a copy of which notice is annexed to the defendants' answer and marked Schedule 1; that the defendants refused to comply with said notice and demand and, since October 2, 1911, to the time of the trial, the defendant *Milwaukee Apparel Company* continued in possession of said premises and operated the said departments previously operated by it, and during said time both the defendant company and the plaintiff continued to transact business with each other in the same manner as business had theretofore been transacted between them, and in general, in substantially the same manner as is provided by the terms of said contract and lease.

"3. That during the time covered by said lease the major portion of the departments in said store were owned and operated by the Herzfeld-Phillipson Company, a corporation, which also owned all the capital stock of the plaintiff corporation; that both of said corporations were under the same general management; that in several of the dealings and transactions with the defendants under said lease, the business of the lessor was conducted in the name of said Herzfeld-Phillipson Company, but during all of said time the plaintiff, *Milwaukee Boston Store,* was the owner of said lease as lessor and was also the owner as lessee of a certain other lease of the entire *Boston Store* formerly made by the John Plankinton estate to one Julius Simon, and assigned by said Simon to the plaintiff; that the plaintiff is the real party in interest

herein, and that in all the dealings and transactions between the parties hereto under said contract and lease, the said dealings and transactions of the Herzfeld-Phillipson Company were performed as the agent of the plaintiff and should be considered as acts performed by the plaintiff.

"4. That the defendants during the time they respectively operated said departments as aforesaid, and between May 1, 1907, and January 31, 1911, without the knowledge or consent of the plaintiff and in violation of the provisions of said contract and lease, sold merchandise to stockholders of the defendant company and to clerks and friends of the defendants at about the cost price thereof without reporting said sales to the plaintiff and without accounting to the plaintiff for the proceeds thereof, or commissions or rentals due the plaintiff thereon, which said sales amount to $19,761.53.

"5. That of the sales so made $19,730.27 thereof was made prior to May 31, 1910, and the violation of the provisions of said contract and lease by the defendant in respect thereto was wilful and intentional on the part of the defendants. The balance of said sale, amounting to $31.26, was made after May 31, 1910, without any wilful or intentional violation of any of the provisions of said contract and lease.

"6. That there is due to the plaintiff from the defendants as rental under said lease a commission of ten per cent. of the amount of said sales, said commission amounting to $1,976.15 principal and $362.22 interest thereon, from the date of said sales to the time of the commencement of this action, amounting in all to the sum of $2,338.37.

"7. That on September 15, 1911, the defendants informed the plaintiff of the fact that said sales had been made without being reported and without commissions paid thereon, and generally, of the nature of the transaction, but not of the amount thereof, and on September 29, 1911, the defendants furnished the plaintiff with full and reasonably accurate information as to the nature and amount of said transactions.

"8. That the plaintiff after being informed of the violations of said contract and lease on the part of the defendants, by its acts, statements and conduct at various times from September 15, 1911, to October 2, 1911, and also at various times after October 2, 1911, and after the commencement of

this action, elected to waive and did waive any right it had to declare a forfeiture of said contract and lease, and during said time treated said contract and lease as being in full force and effect.

"9. That the defendants at large expense built up a valuable trade and business in the departments of said store operated by them; that said plaintiff between May 1, 1907, and the time of the commencement of this action, collected and retained out of money in its hands belonging to the defendant company, large amounts in excess of what it was entitled to retain under its contract, said money being retained on three accounts or branches of business carried on under said contract, known as Newspaper Advertising, Charge Account, and Trading Stamp Account; that the said lease is of great value to the defendants; that the plaintiff's loss on account of the breach of said lease by the defendants is subject to computation in money damages, and that under the circumstances disclosed by the evidence it would be inequitable to permit the plaintiff to enforce a forfeiture of said lease, and the defendants, notwithstanding their breach of the contract, should be relieved from the grounds of such forfeiture by the payment or crediting to the plaintiff of the amount of said money damages.

"10. That from May 1, 1907, to October 3, 1911, the time of the commencement of this action, the defendants ordered through the plaintiff certain newspaper advertising of defendants' departments in said store; that plaintiff procured said advertising to be done and paid the newspaper proprietors therefor; that some of said advertisements so made in said newspapers were special advertisements and included only the defendants' departments in said store, and others were general and included the defendants' departments and also many other departments therein under one head reading 'Boston Store,' the heading was followed by some general editorial matter and then the space in the advertisements was allotted specially to the different departments, and the plaintiff then apportioned the expense of these general advertisements by the measurement of the space devoted specially to each department and collected from the defendants and other department owners the cost of their special advertisements and the cost

of their proportionate share of the general advertisements based upon such measurements. Weekly statements of this cost were rendered by the plaintiff and measurements were checked over and verified by the defendants, and settlements were made on that basis from time to time during said period. In these statements and settlements nothing was included for the expense of the space in the general advertisements covered by the name plate or by the general editorial matter. The amount so paid by the defendants for newspaper advertising during said time was $51,897.51, which was a little over two and four-tenths per cent. of their gross sales. In these weekly statements the charge for newspaper advertising was designated as Advertising. These statements also included a charge called General Advertising, which was always charged to the defendant company at the rate of one and one-half per cent. of its gross sales for the time covered by the statement. This charge the defendants understood to mean a charge for the cost of the proportion of the trading stamps furnished by the plaintiff for the defendants' departments. The evidence on defendants' behalf is to the effect that the plaintiff represented that the cost of trading stamps always equaled or exceeded one and one-half per cent. of the gross sales. I find that such representations were made and that the defendants were justified in believing that the charge of one and one-half per cent. meant a charge for the trading stamps, the cost of which was represented to equal or exceed that amount. Under the conditions existing there was no other justification under the contract for a charge of one and one-half per cent. of the gross sales. During said time the plaintiff retained from the proceeds of the sales in defendants' departments an amount equal to five per cent. of the defendants' credit sales, and represented to the defendants that such charge did not exceed the cost of conducting the Credit System mentioned in the contract. Before this action was commenced the plaintiff never rendered to the defendants any statement of the cost of trading stamps or of the cost of conducting the Credit System, and no settlement was ever made between the parties of said account.

"11. That between May 1, 1907, and October 3, 1911, the plaintiff collected from the defendant company an excessive amount for the cost of trading stamps; that the true condi-

tion of said account during said period and the balance due the defendant company thereon is as follows:

| | | |
|---|---:|---:|
| To amounts collected by the plaintiff from various departments on the basis of one and one-half per cent. of sales.......................................... | | $158,537 41 |
| To amount collected by plaintiff for double trading stamps ........................................ | | 11,017 33 |
| To deductions allowed plaintiff on cost of stamps..... | | 15,004 10 |
| Plaintiff's total receipts..................... | | $184,558 84 |
| By cost of trading stamps in entire store, not including deductions............... | $148,582 74 | |
| By plaintiff's cost for advertising stamps.. | 2,638 26 | |
| By salary of clerks in disbursing stamps.. | 3,107 99 | |
| Plaintiff's total expenses......... | $154,328 99 | $154,328 99 |
| To balance......................................... | | $30,229 85 |

"That during said time the total sales in said store amounted to $10,569,160.93 and that during said time the total sales of the defendants' departments in said store amounted to $2,188,185.97; that under the evidence in this case the proportionate share of the excessive charge for trading stamps to which the defendant company is entitled is 20.7 per cent. of said sum of $30,229.85, which amounts to $6,257.57.

"12. That prior to October 3, 1911, the plaintiff accumulated out of the money derived from the charge of five per cent. on the credit sales in said store a fund more than sufficient to pay the expenses of said Credit System; that prior to said date excessive charges for salaries to the amount of $5,000 were made and deducted from said fund; that on January 31, 1911, $9,190.43, the then credit balance of said fund as it then appeared on plaintiff's books, was transferred on said books to a certain other account referred to as a reserve account to cover bad debts, which transfer was a mere matter of bookkeeping and in no manner changed the rights or liabilities of the parties; that on January 31, 1911, there was charged to said account the sum of $1,350 as rent from August 1, 1910, to August 1, 1911, of the part of the store used by clerks in conducting the credit business, at the rate of $1.50 per square foot for floor space; that the cost to the plaintiff for rent, light, heat, power and janitor service in said store was about $24.81 per square foot, and this charge

was excessive as to the rate thereof, but as no rent charge had theretofore been made for said purpose, I do not find the charge to be excessive for the entire period for which such space was used in conducting said business; that the credit balance of said charge account on plaintiff's books on October 1, 1911, was $2,807.61; that the proportionate amount of said fund which was contributed by the defendant company and to which said defendant is entitled on a distribution thereof, is 27 per cent. thereof; that considering the history of said account, the percentage of recoveries made from time to time from debts charged to profit and loss, the manner in which said fund has been accumulating, and all other evidence on the subject, I find that $2,000 of said fund is a reasonable amount to retain therein and reasonably sufficient to cover all losses which said account will probably sustain in the future over its receipts; that the parties by their contract did not contemplate that said fund should be allowed to accumulate to an amount sufficient to equal all outstanding credit accounts or all possible future losses, nor did they contemplate that the entire credit balance should be distributed whenever a small credit balance happened to exist; that all of said fund in excess of $2,000 should be distributed to the parties entitled thereto; that the amount thereof due the defendant company is as follows:

| | |
|---|---:|
| Balance transferred to Reserve Account January 31, 1911 | $9,190 43 |
| Excessive charge for salary | 5,000 00 |
| Balance of account on books October 1, 1911 | 2,807 61 |
| Credit balance of fund October 1, 1911 | $16,998 04 |
| Reserved to cover losses | 2,000 00 |
| Balance to be distributed | $14,998 04 |
| Amount due defendant company, twenty-seven per cent. | $4,049 47 |

"13. That the plaintiff between January, 1909, and September, 1911, was allowed on its expenses for newspaper advertising by the Journal Company a discount of two per cent. of the face of its bills, which discount amounted to $1,520.13, and between July 6, 1909, and May 16, 1910, the plaintiff received from the Evening Wisconsin Company money amounting to $3,411.40 as a deduction on its advertising bills because of the fact that said newspaper had charged plaintiff for advertising an amount in excess of what it had charged one of plaintiff's competitors for like service; that the plaintiff collected from the defendant company, without

its knowing of said facts, the full amount of the bills rendered for advertising chargeable to it without making any allowance for said discounts and deductions; that said charges were excessive, and there is due from the plaintiff to the defendant company as its proportionate share of said amounts so recovered by the plaintiff, eighteen per cent. thereof, amounting to the sum of $887.67.

"14. That the defendants offered no proof to sustain the allegations of their second, third or fourth counterclaims, and said counterclaims are unproven and untrue."

As conclusions of law the court found:

"1. That the plaintiff is not entitled to any judgment enforcing a forfeiture of the contract or ratifying any attempted forfeiture thereof, or for a recovery of possession of the leased premises.

"2. That the weekly settlements made for newspaper advertising preclude the plaintiff from recovering from the defendants any amount on account of the proportionate cost of the space occupied by the name plate and editorial matter included in the general newspaper advertisements, even if such charge would otherwise have been proper.

"3. That there is due the defendant company:

| | | |
|---|---:|---:|
| As per finding No. 11.......................... | $6,257 | 57 |
| As per finding No. 12.......................... | 4,049 | 47 |
| As per finding No. 13.......................... | 887 | 67 |
| Amounting to.............................. | $11,194 | 71 |
| Less amount due plaintiff of.................... | 2,338 | 37 |
| Leaving a balance due the defendant company | $8,856 | 34 |

"For which amount of $8,856.34, with interest thereon from October 3, 1911, at six per cent. per annum, the defendant company is entitled to judgment against the plaintiff, together with the defendants' costs in this action, to be taxed."

Judgment in conformity with the findings of fact and conclusions of law was duly entered. The plaintiff appealed from the entire judgment which denied the relief asked for in the complaint and which gave the defendants judgment in the sum of $9,795.79. The defendants appealed from the judgment in their favor in so far as it failed to give them a larger amount, to wit, the sum of $13,515.45.

For the plaintiff there were briefs by *Flanders, Bottum, Fawsett & Bottum,* attorneys, and *Charles F. Fawsett, James G. Flanders,* and *George P. Miller,* of counsel, and a separate brief in reply by *George P. Miller,* of counsel, and oral argument by *Mr. Fawsett* and *Mr. Miller.* They contended, *inter alia,* that by the service of the notice on October 2d the plaintiff in unequivocal terms elected to terminate the contract, and the demand for possession contained therein was equivalent in law to a re-entry. *Mash v. Bloom,* 133 Wis. 646, 652, 653, 114 N. W. 457; *Harmon v. Pohle* (Ind.) 92 N. E. 119; *Alexander v. Hodges,* 41 Mich. 691, 694, 3 N. W. 187; *Johnson v. Electric P. A. Co.* (Iowa) 130 N. W. 807; *Jones v. Carter,* 15 M. & W. 718; *Davis v. Moss,* 38 Pa. St. 346; *Ray v. Western Pa. N. G. Co.* 138 Pa. St. 576, 20 Atl. 1065; *Sheaffer v. Sheaffer,* 37 Pa. St. 525; *Hamilton v. Elliott,* 5 S. & R. 375. The acceptance of rent after a forfeiture has actually been declared and perfected by a re-entry or its legal equivalent, or after action for recovery of possession, is not a waiver. 24 Cyc. 1363; 18 Am. & Eng. Ency. of Law (2d ed.) 387; *Cleve v. Mazzoni* (Ky. App.) 45 S. W. 88; *Jones v. Carter,* 15 M. & W. 718, 725; *Schlitz B. Co. v. Nielsen,* 77 Neb. 868, 110 N. W. 746, 8 L. R. A. N. S. 494; *Croft v. Lumley,* 6 H. L. Cas. 672, 713, 744, 745. To allow the defendants to prevail on the ground of a waiver under the circumstances would be to permit them to take advantage of their own wrong. In such a case, the rule that "the burden of proof is upon the party claiming the waiver" should be strictly applied and enforced. 40 Cyc. 269. The contract by its terms (paragraphs 8, 17) clearly contemplated that, upon its termination either by forfeiture or lapse of time, the business, pending the transfer of possession by the defendants, should be continued without interruption. The court should have put an end to the contract and wound up the affairs of the parties by the mutual accounting asked for, even if there had been no express provision for the termination of the contract. 30 Cyc. 656, 657; *Singer v. Heller,* 40 Wis.

544 547; *Wood v. Beath,* 23 Wis. 254; *Adams v. Shewalter,* 139 Ind. 178, 38 N. E. 607; *Barnes v. Jones,* 91 Ind. 161, 165, 166; *Fogg v. Johnston,* 27 Ala. 432, 62 Am. Dec. 771; *Bruce v. Ross,* 18 La. 341; *Seighortner v. Weissenborn,* 20 N. J. Eq. 172; *Flammer v. Green,* 47 N. Y. Super. Ct. 538.

For the defendants there were briefs by *Frank M. Hoyt,* attorney, and *Thomas M. Kearney* and *Glicksman, Gold & Corrigan,* of counsel, and oral argument by *Mr. Hoyt, Mr. Glicksman,* and *Mr. Kearney.* They argued, among other things, that the plaintiff's conduct effected a complete waiver of the forfeiture. Any act in affirmance of a contract by the party entitled to forfeit or rescind constitutes a waiver of that right. *Gomber v. Hackett,* 6 Wis. 323, 324; *Jolly v. Single,* 16 Wis. 280, 290; 24 Cyc. 1360, 1361; *Conger v. Duryee,* 90 N. Y. 594; *Collins v. Hasbrouck,* 56 N. Y. 157; *Goodright v. Davids,* Cowp. 803; *Webster v. Nichols,* 104 Ill. 160; *Levy v. Blackmore* (N. J. Eq.) 67 Atl. 1022; *Bridges v. Longman,* 24 Beav. 27; *Watson v. Fletcher,* 49 Ill. 498; *Camp v. Pulver,* 5 Barb. 91; *Clarke v. Cummings,* 5 Barb. 339; *Bowling v. Crook,* 104 Ala. 130, 16 South. 131, 132; *Brooks v. Rodgers,* 99 Ala. 433, 12 South. 61; *Little Rock G. Co. v. Shall,* 59 Ark. 405, 27 S. W. 562; *Smith v. Edgewood C. Club,* 19 R. I. 628, 35 Atl. 884; *Doe v. Meux,* 4 B. & C. 606, 10 Eng. Com. Law, 417, 15 Eng. Rul. Cas. 760; *Doe v. Lewis,* 5 A. & E. 277, 31 Eng. Com. Law, 333; *Dendy v. Nichol,* 4 C. B. N. s. 376, 93 Eng. Com. Law, 376, 381, 15 Eng. Rul. Cas. 783; *Crouch v. W., St. L. & P. R. Co.* 22 Mo. App. 315; *Ward v. Day,* 4 B. & S. 337, 5 B. & S. 359, 33 L. J. Q. B. 254; *Rump v. Schwartz,* 56 Iowa, 611, 10 N. W. 99; *Deyoe v. Jamison,* 33 Mich. 94; *McKildoe's Ex'r v. Darracott,* 13 Gratt. 278; *E. H. Powers S. Co. v. Odd Fellows Hall Co.* 133 Mo. App. 229, 113 S. W. 253, 258. The reception of rent by the landlord after being advised of the breach of condition is a complete waiver of the breach, and reinstates the lease, even though such rent is accepted after notice of declaration of forfeiture is given. *Gomber v.*

*Hackett*, 6 Wis. 323; *Kenny v. Seu Si Lun*, 101 Minn. 253, 112 N. W. 220; *Michel v. O'Brien*, 6 Misc. 408, 27 N. Y. Supp. 173; *Dahm v. Barlow*, 93 Ala. 120, 9 South. 598; *Goodright v. Cordwent*, 6 Term Rep. 219; *Stromberg v. Western T. C. Co.* 86 Ill. App. 270. That the lessor knows there has been a breach of condition is sufficient to make the subsequent acceptance of subsequently accruing rent a waiver. It is not necessary that he know all the details. *Trauerman v. Lippincott*, 39 Mo. App. 478. Where a right of rescission or to claim or insist upon a forfeiture has been waived, it cannot be revived upon the discovery of a new incident of the fraud or other ground. There is no authority for saying that a party must know all the incidents of the grounds relied upon before he deprives himself of the right of rescinding. *Croft v. Lumley*, 5 El. & Bl. 648, 681; *Campbell v. Fleming*, 1 Ad. & El. 40, 28 Eng. Com. Law, 29; *Upton v. Tribilcock*, 91 U. S. 45, 54; *Bach v. Tuch*, 126 N. Y. 53, 26 N. E. 1019; *Greenwood v. Fenn*, 136 Ill. 146, 26 N. E. 487, 490; *Wilson v. Hundley*, 96 Va. 96, 101, 30 S. E. 492, 494, 70 Am. St. Rep. 837, 842.

The following opinion was filed April 8, 1913:

VINJE, J.    The questions raised by plaintiff's appeal upon its cause of action are these: (1) Did plaintiff have an adequate remedy at law by an action of unlawful detainer? (2) Did the defendant incur a forfeiture of the contract and lease by failing to report the so-called cost sales? (3) Did plaintiff waive the forfeiture? and (4) Are defendants entitled to equitable relief therefrom?

For a proper understanding of the questions of law and fact involved in this case a brief description of the *Boston Store* and of its method of transacting business is deemed necessary. A concise and correct description thereof is contained in plaintiff's brief, and its language, with only minor variations, is for convenience adopted. The *Boston Store* contains about seventy departments operated by department

managers under contracts with the plaintiff in the nature of leases, providing for a joint contribution by the parties to the conduct of the business and for a division of the proceeds between them. It is conducted in a five-story and basement building on Grand avenue, Milwaukee. The entire building is under lease by the plaintiff from the Plankinton estate for the purpose of conducting the business which is being carried on therein. The store was started by one Julius Simon in 1900, who took the lease from the Plankinton estate. In 1904 he organized the *Milwaukee Boston Store* and transferred the lease of the building and all his interest in the business to this corporation and had all the stock of the company issued to himself. Simon continued in the active management and control of the store until October, 1906, when he transferred all the stock thereof to the Herzfeld-Phillipson Company, another corporation which at the time was operating several departments in the store. Since then Simon has had nothing to do with the store. The control and management thereof has been in the Herzfeld-Phillipson Company as the owner of the capital stock of the plaintiff, which has continued to hold the lease from the Plankinton estate. The *Boston Store* has continued to maintain its separate organization, make all subleases of the departments therein and, through its own officers and employees, and the Herzfeld-Phillipson Company acting for it, has continued to conduct the business of the store as the lessor of all the departments and to participate in the conduct and management of the business in the manner and to the extent provided in the various contracts under which the departments are conducted. In the organization and arrangement of the store a certain amount of space is set apart for the conduct of the business of each department in accordance with the provisions of the contract under which the business of the department is conducted, and the lessee of the department is required to confine his operations to that particular space and to sell thereon

only the class or classes of goods specified in his contract and
lease.    The several departments are not shut off from each
other as separate stores.    The same aisles and passageways
used in one department continue through the other depart-
ments on the same floors and all use the same common en-
trances to the building and the same elevators, making, so
far as the physical arrangement is concerned, one large store.
Each department lessee buys the goods for his department,
keeps up his stock, and hires his own clerks to sell the goods
to the customers on the floor of the department.    The *Boston
Store,* besides providing the space and furnishing light, heat,
elevator and janitor services, supervises and has the right to
dictate the arrangement and display of the stock in the dif-
ferent departments.    It makes rules and regulations for the
conduct of the business, passes on all credits to customers,
assumes and collects all accounts, maintains a credit and ac-
counting department for the entire store, takes charge of
bundles, and delivers through a regular delivery system all
goods sold.    It receives the proceeds of all sales, accounting
to the lessees of the departments at intervals for their share
thereof, conducts and controls the entire advertising, and ex-
ercises general supervision and control over the entire busi-
ness.    For the space provided and for its entire contribution
to the business the *Boston Store* retains under its various con-
tracts with the lessees of the departments certain percentages
of the proceeds of sales, all of which, under the terms of the
contracts, must pass through its hands.    All business is re-
quired to be done in the name of the *Boston Store,* and for
the purpose of keeping track of all sales and to see that all
transactions go through the proper channels from the sale of
the goods to the delivery to the customer, and for the pur-
pose of insuring a proper accounting, a uniform system of
rules and regulations has been established which every de-
partment in the store is required to observe.    This system is
as follows: The clerk making a sale is required to make out

duplicate sales tickets on which is entered the description of the article, the price at which it was sold, whether it was a cash or credit sale, and the name and address of the customer. These tickets with the article and also the money, in case of a cash sale, are sent to a cashier of the *Boston Store,* who sits at a desk conveniently located and whose duty it is to make the proper inspection of the checks, stamp them, and pass one with the article on the bundler's desk to be bundled and sent out. If the sale was a cash sale she retains the money, and in any case one of the duplicate tickets is retained properly stamped and sent to the auditing department, where the proper record is kept.

1. The defendants contend that the relation of the parties was that of landlord and tenant and therefore plaintiff had an adequate remedy at law by an action of unlawful detainer. This defense was specifically pleaded by them in their answer and is insisted upon in this court. Our attention is called to that part of the prayer for relief which reads, "That it be adjudged and decreed that the plaintiff is entitled as against the defendants . . . to the possession of the premises referred to in or covered by said agreement and lease, and that the defendants be ordered and adjudged to quit and surrender the same to the plaintiff, and that they be permanently and forever enjoined from interfering with the possession of said premises by the plaintiff," and to the fact that just such relief is prayed as would be covered by the judgment rendered in an action of unlawful detainer. We are also referred to eighteen or more clauses in the agreement where the term *lease* is used or where language is employed that is strictly germane to the terms of a lease, and the case of *Porter v. Merrill,* 124 Mass. 534, is cited to the point that "the possession and control of the premises must pass to the tenant, but such possession need not in all cases be complete or exclusive." That was a case where the plaintiff had rooms in an apartment house known as the Bellevue, which also contained a

restaurant in which he could take his meals or not as he elected. The lease provided for a specified charge per meal if served in plaintiff's rooms, and contained a prohibition against cooking therein and also some further restrictions as to their use. The court said:

"The written contract declared upon purports to be a lease, for a precise time and at a definite weekly rate, of certain specific rooms, so separated from all other rooms in the same house as to become in fact and in law the separate tenement of the lessees. . . . The fact that, besides leasing the rooms, the lessor undertakes to furnish certain specific accommodations, and imposes certain restrictions as to the manner in which the premises are to be occupied or used, does not change the essential character of the instrument."

It is evident there was no joint possession in that case. As bearing upon the claim that the contract between the parties was a lease, the cases of *Oliver v. Moore,* 131 N. Y. 589, 30 N. E. 67, affirming same case reported in 53 Hun, 472, 6 N. Y. Supp. 413; *Fiske v. Framingham Mfg. Co.* 14 Pick. 491; and *Jordan v. Indianapolis W. Co.* 159 Ind. 337, 64 N. E. 680, are cited. It is sufficient to say of them that they are so variant in their facts from the case at bar that they are practically valueless as authorities upon the question before us.

It is true that the agreement is in a certain sense a lease, but it is more than that. It provides for the carrying on of a joint business in which plaintiff furnishes the space, does the bundling and the delivery, and has charge of credits, advertising, and the general conduct of the business, and the defendants buy the goods, make the sales, hire and pay the clerks, turn over the money on cash sales to plaintiff to be by it accounted for later, and out of the gross proceeds of the sales the plaintiff retains ten per cent. as its compensation for the space furnished and services rendered, not including certain services in the credit and advertising departments. There is also a joint possession of certain aisles and ap-

proaches in the store, and the plaintiff retains the key thereof, though all the space leased is within it. Joint show windows are to be decorated under the direction of plaintiff, suitable regard being had to the reasonable wishes of the defendants. And as to bargain sales, it is provided the plaintiff may buy goods for the same if the defendants decline to do so. Many other features of the agreement could be adverted to for the purpose of showing that it is more than a lease. It creates such business and fiduciary relations between the parties as to be more properly denominated a partnership or *quasi*-partnership agreement than a lease. The plaintiff held joint possession with the defendants of certain portions of the space, and in a sense had the physical control of all of it, for by locking the doors it could exclude the defendants therefrom and compel them to resort to legal process to regain possession. So it is evident that an action of unlawful detainer would not give plaintiff the relief prayed for, or to which it would be entitled under evidence sustaining the allegations of the complaint. An accounting involving complicated business relations covering a number of years is also asked for. In fact the suit partakes more of the nature of the dissolution of a partnership and the settlement of the account between the parties than the mere adjudication of the right of possession of the space in plaintiff's store. It is therefore deemed that plaintiff did not have an adequate remedy at law and that the suit was properly brought in equity.

2. The defendants argue that the cost sales were not sales for which they were required to account or pay a commission upon. In support of this they rely upon evidence showing that a custom had obtained for a long time in the store permitting sales to clerks and managers at cost, and that such sales were not reported to plaintiff. The latter denies that it was aware of the custom, and while it concedes that the owners of the department might perhaps be entitled to take out goods for themselves and the members of their families

such right did not extend to clerks and friends of owners and employees. The terms of the agreement are that the defendants will pay to plaintiff "ten per centum (10 %) on the gross sales of said department." This is the measure of plaintiff's compensation for the space furnished and services rendered by it. And it is evident that such compensation cannot be arbitrarily or unreasonably diminished by the defendants without its consent. The agreement further provides that "all merchandise sold in said department and money received from sales shall be immediately delivered to and handled by the cashier of the party of the first part." The terms "gross sales" and "all merchandise sold" are broad and comprehensive enough to include cost sales to employees. It could certainly not have been the intention of the parties that plaintiff was to receive a commission only on sales made at a profit, for if that were so, the agreement would undoubtedly have contained apt terms expressing such intention. It is a matter of common knowledge that a certain class of goods at times is sold at cost or less to the general public, but such sales are none the less sales within the meaning of the agreement. Whether or not a certain transaction constitutes a sale is entirely independent of the element of a profit to either party to the transaction. Therefore, when defendants sold goods to their employees they made a sale thereof just as much as if they had sold them to the public, and plaintiff was entitled to a commission upon such sales irrespective of whether or not the defendants made a profit upon them. The evidence shows that over $1,200 worth of goods were sold to others than employees and owners of the department.

But it is claimed that even if these cost sales were within the terms of the agreement a failure to report them did not work a forfeiture, because such failure was not wilful or intentional. The evidence on this branch of the case is somewhat conflicting, and, since the trial court has found in favor of the plaintiff upon such issue, it remains only to examine

the evidence to see if it is sufficient to sustain the finding. We shall not review it at any length, but only refer to a few salient points therein that show the finding is based upon sufficient evidence. Practically all of the goods so sold were bundled and delivered by the defendants themselves. They were not sent to the cashier's desk at all, and plaintiff was precluded from knowing anything either as to the quantity or value of goods so sold. When credit was given no report thereof was made to the credit department, nor was plaintiff allowed to pass upon the question of credit as provided for in the agreement. The true nature of the sales was concealed by entering all goods so sold in the "Return Merchandise Account" at first, and later in an account under the name of "M. Phillipsborn." No adequate explanation was given by the defendants of such method of bookkeeping. The evidence also showed that part of the defendants' books relating to their sales had been destroyed, but a fairly satisfactory explanation of such destruction was given. From the whole evidence we are satisfied that the trial court properly found that an intentional effort was made by the defendants to conceal these sales from plaintiff, both by the manner in which the goods were bundled and delivered and by the manner in which their true nature was concealed by the method of bookkeeping resorted to. It is plain that a cost sale to any one should not be entered in the account of "Merchandise Returned," and the explanation that it was so entered because there was no profit in it is entirely inadequate, coming as it does from men experienced in business and bookkeeping. The defendants knew the agreement entitled plaintiff to ten per cent. commission on all sales; that all sales were required to be reported to plaintiff and go through the regular channels of its business; and that it had no means of knowing what the sales were or of collecting commissions thereon unless they were reported. When, therefore, in the face of such knowledge, they actually concealed such sales from plaintiff

both by the manner in which the bundling and delivery was done and by the manner in which the books were kept, they must be held to have intentionally violated the terms of the agreement. So we conclude that the finding of the trial court to the effect that the cost sales made by the defendants prior to May 31, 1910, and aggregating $19,730.27 were in violation of the provisions of the agreement and were wilfully and intentionally concealed by them from the plaintiff, is supported by the evidence.

3. It appears from the evidence that on September 15, 1911, plaintiff was first informed by the defendants of the fact that they had made unreported sales to employees. The evidence as to the extent of the disclosure is somewhat in conflict. Plaintiff contends that the defendants represented the sales were quite trivial in amount, while the defendants claim that, although no amount was stated by them, yet the impression conveyed to the plaintiff was not that the sales were entirely trivial in amount, and they claim that Mr. Stone, acting on behalf of the plaintiff, in reply to a statement made by Mr. Hoyt, who represented the defendants, that they were willing to submit a report of such sales and pay a commission thereon if desired, said: "That is not necessary; we don't desire it." This much, however, remains certain: No definite conclusion or agreement was arrived at on that date. On the 19th of September the plaintiff by a letter to the defendants stated:

"In order that we may be fully advised as to the nature and extent of the transactions of this character, we would respectfully request that you furnish us at once with as full and complete statement as you are able to give, showing the dates, number, and amounts of such transactions and the period over which the same have extended."

The defendants immediately replied to this letter, stating they would comply with its request but that it would take some time to prepare the required statement. On September

29th the defendants furnished such statement to the plaintiff, and then, for the first time, it learned of practically the full amount of unreported sales, except as to a correction made thereto October 3, 1911, which increased the amount of $17,836.75 reported to $19,730.27.

The defendants claim that the plaintiff, after full knowledge of all the facts and circumstances relating to the breach of the agreement, has waived the same: (1) By negotiating with the defendants on September 18th for an extension of the lease to cover additional space; (2) by continuing to do business under the lease, receiving all the benefits thereof without any notice whatever to the defendants until the afternoon of September 19th; (3) by continuing to do business under the lease, receiving all the benefits thereof from September 19 to October 2, 1911, without notice of any intention to declare a forfeiture; (4) by continuing to do business and exacting and receiving from the defendants all the benefits and payments due it under the lease from October 2, 1911, down to the commencement of the action, after it had been notified by the defendants that its claim of forfeiture of the lease was without foundation and that they would continue to keep the premises thereunder and that they insisted upon the plaintiff performing the duties imposed upon it by the lease; and (5) by exacting and receiving from the defendants, after the commencement of the action and in January, 1911, money for a sprinkling charge for a period ending in the month of June, 1912, as part of the compensation for the use of said premises for that period.

It is quite apparent from any version of the testimony that plaintiff was not fully informed as to the extent of the unreported cost sales until September 29th. That the extent of such sales might materially influence it in determining whether or not it would insist upon a forfeiture is quite apparent. It might be willing to overlook a trifling breach

when it would not tolerate a substantial one. It is elementary that a waiver must be predicated upon the intentional relinquishment of a known right. *Monroe W. W. Co. v. Monroe,* 110 Wis. 11, 85 N. W. 685. And it is obvious that in order to constitute a known right the substantial facts and circumstances out of which the right springs must be known. Here the plaintiff was not substantially in possession of such facts and circumstances till September 29th. It acted quite promptly in demanding a full disclosure of the facts. And after it was in possession thereof it was entitled to a reasonable time to consult counsel and consider the situation, as to what should be done. That it took seasonable action after the 29th of September cannot be doubted. Hence no waiver can be predicated upon its acts prior to September 29th, and none upon its failure to act promptly thereafter.

But the question whether its acts subsequent to October 2d do not in fact constitute a waiver of the forfeiture is more serious. A large number of cases are cited by the defendants showing that the receipt of rent by a landlord after a breach constitutes a waiver thereof. For reasons already stated these cases have only a partial or qualified application, since the relations between the parties are not solely those of landlord and tenant. As will be seen by a reference to plaintiff's letter of September 30th giving notice of a cancellation of the agreement, it offered to continue to transact the business of the department in the manner in which it had theretofore been transacted, without prejudice to its right to insist upon a forfeiture, until a surrender was made by the defendants as therein required. And in its letter of October 4th it gave notice "that pending the determination of the action which has been begun to enforce the rights of the *Milwaukee Boston Store* in the premises, all goods sold by you from said department and delivered to us will be accounted for and handled by us, and the business of said department, regardless of the contract which has been terminated, will be conducted on our

part substantially as heretofore, except that we shall apply to the court as soon as practicable for an order authorizing the deposit, until the surrender by you of said department, of the proceeds of such sales or so much thereof as may be sufficient to indemnify us against loss or damage sustained by us and which may hereafter be sustained by reason of your unlawful withholding from us of the possession of said department to which we are now entitled. And in the meantime and until such order shall be made the percentages of the proceeds of sales which we shall retain as heretofore will be applied on account of such loss and damage." Defendants' reply to plaintiff's letter of September 30th contained an unqualified refusal to surrender possession and notified it that they should continue to hold under their lease, and demanded of the plaintiff that it continue the performance of the duties imposed upon it thereunder.

The plaintiff never applied to the court for the order mentioned in its letter of October 4th. So if it held the percentages of the proceeds of sales as damages at all, it held the same by virtue of the right declared in the last sentence of said letter. It is a little difficult to understand just what is meant by such sentence, taken in connection with the previous statement in the letter that the business would be conducted substantially as theretofore. Under the previous conduct of the business plaintiff was entitled to retain ten per cent. on all sales as its share of compensation for space furnished and services rendered. If the business was continued the same as before it was entitled to retain the like percentage for such space and services, and there would be nothing left to apply towards damages for withholding possession. That the business continued to be conducted after the action was begun and down to the time of the trial precisely as it had been from the inception of the agreement, was conceded upon the trial and so found by the court. Plaintiff therefore retained no money in its hands out of sales made subse-

quent to the commencement of the action out of which it could reimburse itself for damages. The defendants by unequivocal language notified plaintiff that they should continue to hold under the 'agreement. This was equivalent to informing it that the ten per cent. retained should be applied upon the amount due it for the use of the space and the services rendered by it pursuant to the agreement. Admitting that the defendants owed plaintiff damages for withholding possession, they also owed it ten per cent. on sales made, hence they as debtors, and not the plaintiff as creditor, had the right to say upon what debt the money they turned over to plaintiff should be applied. *Jones v. Williams,* 39 Wis. 300; *Kehl v. Smith,* 87 Wis. 212, 58 N. W. 244. Having declared that it should be applied upon the debt for space and services, which debt the plaintiff never waived, the latter could not apply it upon any other debt or hold it for other purposes. The plaintiff, therefore, with full knowledge of the facts, retained the ten per cent. as the compensation provided in the agreement, and not to indemnify it for damages.

There is much force in plaintiff's argument that great loss would accrue to it by a sudden termination of business relations between the parties, and that it ought not to be subjected to such loss as a condition of insisting upon the forfeiture. On the other hand, should plaintiff be permitted to reap the benefits of the agreement and at the same time claim that it was canceled? The loss to the defendants from a sudden termination of business relations and their loss after a short prolongation thereof would not differ very materially, while to the plaintiff, if it could continue the business uninterruptedly, the difference would be very great. In the latter case it might sustain practically no loss at all, while in the former it might seriously affect its whole business for a time. When it elected to break with the defendants it was incumbent upon it to weigh the advantages and disadvantages of the situation. It ought not to be permitted to accept the advan-

tageous part, namely, that of securing control of defendants' business, and at the same time compel them to accept its terms of a temporary continuance thereof in order that it might relieve itself from the consequent loss of flatly standing upon its right of forfeiture. When declarations and conduct are at variance, as here, the conduct and acts of the party must be held to outweigh the declarations and be controlling. For these reasons it is considered that the plaintiff, by its continuing the business with the defendants in the manner and under the circumstances stated after October 2, 1911, waived the forfeiture.

4. Having held that plaintiff waived the forfeiture, it perhaps becomes unnecessary to determine whether the defendants would be entitled to equitable relief in the absence of a waiver. In view of the importance and peculiar circumstances of the case, however, we prefer to base our decision upon both grounds. It is the settled doctrine of this state that equity will relieve against a forfeiture resulting from a condition broken where such condition was intended as security for the payment of money. *Gates v. Parmly,* 93 Wis. 294, 66 N. W. 253, 67 N. W. 739; *Maginnis v. Knickerbocker Ice Co.* 112 Wis. 385, 88 N. W. 300; *Raddatz v. Florence Inv. Co.* 147 Wis. 636, 133 N. W. 1100. And especially is this so where full compensation can be made by a money judgment. In this case the agreement between the parties provided that it should become void and all rights of the second party thereunder should immediately cease if the second party should wilfully and intentionally violate any of the covenants, promises, or agreements therein contained. The defendants in failing to report the cost sales and at once turn over to the plaintiff the proceeds thereof violated the condition of the agreement which required them to do so. That the condition violated was one that was intended as security for the payment of the ten per cent. due plaintiff under the agreement cannot well be doubted. Its purpose is aptly

stated on page 54 of plaintiff's brief, as follows: "The provision for payment of ten per cent. commission, read in connection with the other provisions of the contract, merely measured the amount the plaintiff was entitled to retain. The *payment* was secured by the requirement that the specific proceeds of the sales were to be turned over immediately to the plaintiff." We have therefore a case where the condition broken is one that was intended as security for the payment of money, and also where money can fully compensate its breach. It is then within the field of equitable relief.

Let us now briefly review the situation of the parties and consider the relative hardships that would result by granting or refusing to grant relief, and also the relative delinquencies of the parties towards each other in their dealings under the agreement. As will be seen from the findings of the trial court, contained in the statement of facts, between May 1, 1907, and October 3, 1911, the total sales in defendants' department amounted to $2,188,185.97. Their agreement does not expire till 1922, and they have an option for a further extension at that time under certain contingencies. That good judgment and splendid management have gone into the creation of a business of such magnitude is self-evident. The good will thereof is of great value, and if plaintiff could succeed to it unimpaired it would be greatly enriched thereby. Were the defendants required to vacate the premises they could not carry any great portion of the business with them. The result would be that plaintiff would reap a large benefit from the established business and the defendants practically none. That plaintiff, too, by good judgment and business ability has aided in its creation may be freely conceded. But the fruits of the joint effort should not all go to one party except for grave cause.

The delinquency of the defendants in failing to report the cost sales is established. And for the purposes of the case we will assume that no excuse exists to mitigate it except the

fact that the custom was promptly discontinued when they were advised that such sales were in violation of the agreement. On the other hand, the plaintiff's conduct is not altogether such as to appeal strongly to the conscience of the court. It withheld from defendants the fact that it had secured substantial rebates on advertising contracts, eighteen per cent. of which belonged to them, amounting in all to $887.67. It failed to disclose to them the true cost of the credit department and had entered up against it $5,000 in excessive salaries, $3,000 of which went to plaintiff's president. The total moneys belonging to the defendants which it kept back as to this item were $4,049.47. It retained in its possession the sum of $6,257.57 due the defendants on an overcharge in the trading-stamp account. It is not necessary to say that these sums were fraudulently withheld from the defendants. It is sufficient to say that they were withheld, and the first, at least, without any pretense of right. Viewed in connection with these acts of plaintiff, the failure of the defendants to report sales upon which the plaintiff was entitled to a commission of $2,338.37, including interest, does not call so loudly for the forfeiture of a business whose value renders their omission almost trivial by comparison. It was no doubt with this idea in mind that the learned trial judge said that "under the circumstances disclosed by the evidence it would be inequitable to permit the plaintiff to enforce a forfeiture of the lease." The conclusion reached upon all the facts in the case is that, had there been no waiver of the forfeiture by the plaintiff, equity would relieve against it.

The questions arising upon the counterclaim relate to three separate accounts, known as Newspaper Advertising, Trading Stamp Account, and Charge Account. These are fully set forth in the trial court's findings numbered 10, 11, and 12, respectively, included in the statement of facts, to which reference may be had for a fuller understanding thereof. We have carefully examined the statement of these accounts

and the evidence relative to the same and have reached the conclusion that the accounting as made by the trial court should not be disturbed. To restate the accounts here and give in detail the reasons for the conclusions reached as to the numerous items would unreasonably and uselessly extend this opinion.

Under the provisions of the agreement between the parties and the practical construction given it by them since its inception, the trial court properly refused to reimburse plaintiff for the amount of money it had paid newspapers for headplates and editorials relating generally to the *Boston Store,* and not to any specific department. Nor could the cost of the trading stamps be charged to this class of general advertising, though plaintiff's books showed that it was. The use of trading stamps constituted a special form of advertising and was separately provided for in the agreement and a maximum limitation of one and one-half per cent. of the gross sales fixed. It may be conceded that an absolutely accurate account of the cost of trading stamps to each department could not be stated. But facts were at hand which made it possible to state an account substantially accurate, and that was done by the trial court.

As to the Charge Account, the court under the evidence properly disallowed excessive salaries in the sum of $5,000 for extra managerial services. It also did not abuse its discretion in retaining the sum of $2,000 in the account as a reserve fund. Under the evidence showing rapid increases of late years in the credit balances of this account, that sum would seem to be sufficient.

The defendants claim the court erred in allowing plaintiff commissions on the cost sales not reported, amounting to $2,338.37; in allowing plaintiff clerk hire in the stamp department to the amount of $643.35; in allowing an excess salary charge in the credit department of $810, and a rent charge therein of $364.50; in refusing to allow them interest

on credit balances in the credit department amounting to $436.11, and in refusing to give them interest on overcharge in advertising to the amount of $56.80, in all the sum of $4,649.13. Though plaintiff concedes that if it is proper to undertake to determine any of the counterclaims in this action the defendants may be entitled to interest on the Journal overcharge amounting to $22.57, we think the court properly disallowed it in view of the manner in which the mistake was made by plaintiff in not sooner refunding the overcharge. As to other claims made by the defendants upon this appeal, it appears that the findings of the trial court upon them are sustained by the evidence and ought not to be set aside.

*By the Court.*—Judgment affirmed on both appeals. No costs allowed to either party, except that the defendants shall recover clerk's fees and cost of printing not to exceed $75.

Siebecker, J., took no part.

A motion for a rehearing was denied, with $25 costs, on May 31, 1913.